POMERANTZ LLP
Jonathan D. Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jlindenfeld@pomlaw.com

*Attorney for Plaintiff*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUSTIN PRIEWE, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| v. | |
| ELECTROCORE, INC., FRANCIS R. AMATO, GLENN S. VRANIAK, BRIAN POSNER, CARRIE S. COX, MICHAEL G. ATIEH, JOSEPH P. ERRICO, NICHOLAS COLUCCI, THOMAS J. ERRICO, TREVOR J. MOODY, MICHAEL W. ROSS, DAVID M. RUBIN, and JAMES L.L. TULLIS, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Justin Priewe ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by electroCore, Inc. ("electroCore" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by electroCore; and (c) review of other publicly available information concerning electroCore.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that: a) purchased or otherwise acquired electroCore common stock pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's June 2018 initial public offering ("IPO" or the "Offering"); and/or b) purchased or otherwise acquired electroCore securities between June 22, 2018 and September 25, 2019, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      electroCore is a bioelectronic medicine company with a non-invasive vagus nerve stimulation ("VNS") therapy. Its lead product gammaCore is used for the acute treatment of pain associated with migraine and episodic cluster headache in adults.

3.      On June 25, 2018, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold 5,980,000 shares of common stock at a price of $15.00 per share. The Company received proceeds of approximately $79.5 million from the Offering, net of underwriting discounts and commissions. The proceeds

from the IPO were purportedly to be used to commercialize gammaCore products, expand its clinical program into additional indications in headache and rheumatology, build its specialty distribution channel for the anticipated launch of gammaCore Sapphire, and for working capital and other corporate purposes.

4.      On May 14, 2019, electroCore announced first quarter 2019 financial results that fell short of investors' expectations, reporting $410,000 net sales and an operating loss of $14.2 million.

5.      On this news, electroCore's share price fell $1.58 per share, or nearly 30%, to close at $3.75 per share on May 15, 2019, on unusually heavy trading volume.

6.      On September 25, 2019, electroCore revealed that the U.S. Food and Drug Administration ("FDA") requested more information and analysis of clinical data for electroCore's 510(k) submission, which seeks an expanded indication for the use of gammaCore.

7.      On this news, electroCore's share price fell $0.79 per share, or over 23%, to close at $2.57 per share on September 25, 2019, on unusually heavy trading volume.

8.      By the commencement of this action, electroCore's shares continue to trade significantly below the IPO price of $15.00 per share.  As a result, investors were damaged.

9.      The Registration Statement was false and misleading and omitted to state material adverse facts.  Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (i) that the Company's lead product, gammaCore, did not enjoy any advantages over other acute treatments for migraines and episodic cluster headaches; (ii) that, as a result, doctors and patients were unlikely to adopt gammaCore over existing treatments; (iii) that the Company's voucher program

was not effective to increase adoption of gammaCore; (iv) that the Company lacked sufficient resources to successfully commercialize gammaCore; (v) that the Company's business plan and strategy was not sustainable because electroCore lacked sufficient revenue to be profitable; (vi) that the Company's product registry and efforts were ineffective to initiate reimbursement policies by commercial payors for gammaCore; (vii) that the lack of reimbursement would materially impact adoption and sales of gammaCore; (viii) that the Company lacked sufficient clinical data demonstrating that gammaCore was effective and safe for migraine prevention; (ix) that, as a result, the Company's 510(k) submission for the use of gammaCore for migraine prevention was unlikely to be approved by the FDA; and (x) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

10.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  The Company's principal executive offices are located in this district.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.     Plaintiff Justin Priewe, as set forth in the accompanying Certification, incorporated by reference herein, purchased or otherwise acquired electroCore common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO and/or electroCore securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant electroCore is incorporated under the laws of Delaware with its principal executive offices located in Basking Ridge, New Jersey.  electroCore's common stock trades on the NASDAQ exchange under the symbol "ECOR."

17.     Defendant Francis R. Amato ("Amato") was, at all relevant times, the Chief Executive Officer and a Director of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

18.     Defendant Glenn S. Vraniak ("Vraniak") was the Chief Financial Officer ("CFO") of the Company until April 1, 2019, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

19.     Defendant Brian Posner ("Posner") has been CFO since April 1, 2019.

20.     Defendants Amato, Vraniak, and Posner (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

21.     Defendant Carrie S. Cox ("Cox") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

22.     Defendant Michael G. Atieh ("Atieh") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

23.     Defendant Joseph P. Errico was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

24.     Defendant Nicholas Colucci ("Colucci") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

25.     Defendant Thomas J. Errico was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

26.     Defendant Trevor J. Moody ("Moody") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

27.    Defendant Michael W. Ross ("Ross") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

28.    Defendant David M. Rubin ("Rubin") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

29.    Defendant James L.L. Tullis ("Tullis") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

30.    Defendants Amato, Vraniak, Cox, Atieh, Joseph P. Errico, Colucci, Thomas J. Errico, Moody, Ross, Rubin, and Tullis are collectively referred to hereinafter as the "Securities Act Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

31.    electroCore is a bioelectronic medicine company with a non-invasive VNS therapy. Its lead product gammaCore is used for the acute treatment of pain associated with migraine and episodic cluster headache in adults.

### The Company's False and/or Misleading Registration Statement and Prospectus

32.    On June 21, 2018, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1MEF, which forms part of the Registration Statement. The Registration Statement was declared effective the same day.

33.    On June 25, 2018, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold 5,980,000 shares of common stock at a price of $15.00 per share. The Company received proceeds of approximately $79.5 million from the Offering, net of underwriting discounts and commissions. The proceeds from the IPO were purportedly to be used to commercialize gammaCore products, expand its

clinical program into additional indications in headache and rheumatology, build its specialty distribution channel for the anticipated launch of gammaCore Sapphire, and for working capital and other corporate purposes.

34.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

35.    Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

36.    According to the Registration Statement, the addressable market in 2018 for treatment of migraines and of cluster headaches was approximately $3.8 billion and $400 million, respectively.  Moreover, the Registration Statement touted electroCore's competitive advantages over its competitors, stating, in relevant part:

> We believe the competitive strengths of our company and our novel and proprietary self-administered bioelectronic therapy include:
>
> - ***Innovative bioelectronic medicine approach.*** Our gammaCore therapy uses a proprietary electric signal to safely deliver bioelectronic medicine, which causes targeted pharmacologic-like changes in neurotransmitter expression and in the immune system without systemic exposure to exogenous chemicals.
>
> - ***Our non-invasive therapy unlocks the long-held potential of VNS.*** VNS therapy can, for the first time, be delivered comfortably through the skin using gammaCore. This eliminates the need for costly, invasive surgery that has been reserved for the most refractory patients, requiring the implantation of a permanent medical device.
>
> - ***Commercializing our therapy through traditional pharmaceutical channels.*** Our non-invasive delivery modality permits medical professionals to prescribe VNS through the same channel they would any

other specialty medication. Refills delivered on a monthly basis enable us to seek widespread commercial payor coverage and reimbursement under a traditional pharmaceutical model. We have agreements in place with commercial payors that we believe, based on our estimates, will provide for reimbursement for gammaCore as a pharmacy benefit for approximately 17 million commercial lives with such number expected to increase to as many as 45 million lives under these agreements over the next several calendar quarters.

- ***Highly scalable and low investment manufacturing with digital refills.*** Our low manufacturing and assembly costs allow us to scale to meet demand with minimal additional investment. Refills through RFID or Bluetooth may offer attractive gross margins.

37.    Regarding commercializing gammaCore, the Registration Statement stated that the

Company would focus on three priorities:

- ***Drive advocacy of gammaCore as a leading headache therapy.*** Our strategy is to establish gammaCore as a preferred treatment option, initially in episodic cluster headache and expanding into migraine. We are developing advocacy for gammaCore among key opinion leaders through our clinical program and initial product registry. We currently have in excess of 300 clinicians trained on gammaCore use and over 600 unique prescribers. Of these, 50 are key opinion leaders who will lead a series of programs to educate their colleagues on our clinical data and our specialty pharmacy distributor and its national network of specialty pharmacies.

- ***Drive reimbursement of our therapy.*** Through our product registry and initial commercialization efforts we are generating prescriptions and patient claims to prompt commercial payors to initiate reimbursement policies for gammaCore. We have engaged over 50 national and regional commercial insurance payors in the United States with the goal of obtaining reimbursement coverage as a pharmacy benefit. gammaCore is currently the subject of agreements with commercial payors that we believe, based on our estimates, will provide for reimbursement for gammaCore as a pharmacy benefit for approximately 17 million commercial lives, with such number expected to increase to as many as 45 million lives under those agreements over the next several calendar quarters. In addition, our access negotiations have entered the active clinical review stage with more than a dozen additional insurance plans covering approximately 120 million additional commercial lives.

- ***Build a leading commercial presence.*** We have partnered with an established specialty pharmacy distributor to provide physician and patient support to quickly onboard patients and manage payor interactions. This

support includes adjudication of all gammaCore prescriptions, payor claims for reimbursement, and patient support and training. Our sales force targets high-prescribing U.S. neurology practices and headache centers. We currently have a sales force of 18, with three medical science liaisons. We plan to hire an additional 14 territory business managers, who will ultimately cover 6,400 high-prescribers of headache medications.

38.     Regarding gammaCore sales, the Registration Statement stated, in relevant part:

In February 2018 we began a formal physician training program highlighting the clinical evidence and benefits of gammaCore for the acute treatment of pain associated with migraine and episodic cluster headache. ***Concurrently, to incentivize these physicians to issue prescriptions and increase market penetration, we began a voucher program providing new patients with a one-time 31-day therapy at no charge to the patient. While the voucher program has increased demand, the transaction price for each unit sold through the voucher program is reduced by the amount of the one-time free 31-day therapy which offsets the effects of the increased demand for gammaCore.*** Our revenue reflects only gammaCore units sold either for new patients, or existing patients refills, that are not related to our voucher program.

39.     Although the Registration Statement disclosed declining revenues in the first quarter of 2018, the Company attributed the trend to the voucher program rather than to competition:

Net sales decreased $35.7 thousand to $81.2 thousand for three months ended March 31, 2018, from $116.9 thousand for the three months ended March 31, 2017. The decrease is primarily due to a reduction in the transaction price related to the cost of voucher program and the co-payment assistance program. Net sales are not recognized for gammaCore units redeemed, or estimated to be redeemed under the Company's voucher program.

40.     The Company had hired additional personnel in anticipation of commercial sales, as the Registration Statement stated:

In anticipation of clearance from the FDA and commencement of commercial sales in the United States, we incurred a significant increase in compensation costs as additional personnel were hired to oversee the execution of the commercial plan in the United States and Europe. Significant expenses include costs associated with marketing and advertising, salesforce, professional fees for legal services, including legal services associated with our efforts to obtain and maintain broad protection for the intellectual property related to our products, rent, compliance, payor reimbursement development, accounting services, and consulting fees.

41.    The Registration Statement was materially false and misleading and omitted to state:  (i) that the Company's lead product, gammaCore, did not enjoy any advantages over other acute treatments for migraines and episodic cluster headaches; (ii) that, as a result, doctors and patients were unlikely to adopt gammaCore over existing treatments; (iii) that the Company's voucher program was not effective to increase adoption of gammaCore; (iv) that the Company lacked sufficient resources to successfully commercialize gammaCore; (v) that the Company's business plan and strategy was not sustainable because electroCore lacked sufficient revenue to be profitable; (vi) that the Company's product registry and efforts were ineffective to initiate reimbursement policies by commercial payors for gammaCore; (vii) that the lack of reimbursement would materially impact adoption and sales of gammaCore; and (viii) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

**Materially False and Misleading**
**Statements Issued During the Class Period**

42.    The Class Period begins on June 22, 2018.  On that day, the Company's stock began trading on the NASDAQ exchange.

43.    On August 13, 2018, the Company announced its second quarter 2018 financial results, reporting net sales of $393,000 and an operating loss of $16.2 million.

44.    On November 13, 2018, the Company announced its third quarter 2018 financial results, reporting net sales of $150,972 and an operating loss of $13.2 million.

45.    On March 27, 2019, the Company announced its fourth quarter and full year 2018 financial results, reporting full-year net sales of $933,000 and an operating loss of $54.6 million. Moreover, the press release stated, in relevant part:

**Fourth Quarter 2018 and Recent Highlights**

- Generated in excess of 5,800 gammaCore® prescriptions in the fourth quarter of 2018, an increase of more than 30% from the third quarter 2018

- Generated approximately 15,000 gammaCore® prescriptions in 2018

- Over 1,800 unique prescribing physicians through the fourth quarter of 2018, up from approximately 1,500 in the third quarter 2018

- Commercial payer coverage together with the Federal Supply Schedule increased covered lives to 53 million

46.     On March 28, 2019, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2018 (the "2018 10-K"), affirming the previously reported financial results.  Moreover, the 2018 10-K stated that the Company had conducted clinical studies supporting the use of gammaCore for migraine prevention, stating, in relevant part:

> ***Potential for rapid label expansion in headache and regulatory approval in additional indications.*** The safety profile of gammaCore enabled us to utilize the de novo regulatory pathway through which the FDA established a new therapeutic category: External Vagus Nerve Stimulator for Headache (21 CFR 882-5892). Through the 510(k) pathway, we received clearance for our gammaCore therapy for the acute treatment of pain associated with migraine in adults in January 2018, and clearance for the prevention of cluster headaches in December 2018. We believe a similar regulatory pathway may be available to us for additional indications in headache, including the prevention of migraine, the expansion of our label to include adolescents, and the treatment of post-traumatic headaches. We also anticipate seeking regulatory authorization to commercialize our therapy in rheumatological conditions through similar pathways.

* * *

> **Migraine Prevention**
>
> As previously described, the grant by FDA of our de novo submission resulted in a new Class II regulatory category: External Vagus Nerve Stimulator for Headache (21 CFR 882-5892). The establishment of this product category permits us to apply for label expansions through the 510(k) regulatory pathway utilizing our own product as the predicate. With the recent clearance of our label expansion to CH, it is now our intention to seek the expansion of our label for the prevention of migraine. As described below, we have conducted, and continue to conduct clinical studies to support this indication.

* * *

12

**Clinical Data in Support of gammaCore for Migraine Prevention**

***Our EVENT Trial – Chronic Migraine Headache Prevention with gammaCore***

Our EVENT trial was a multi-center, randomized, sham-controlled pilot clinical trial with respect to the use of our gammaCore therapy for the prevention of chronic migraine and was published in 2016. This prospective double-blind pilot trial was conducted at six tertiary care headache centers in the United States.

\* \* \*

During the open-label period, the original gammaCore cohort experienced continued reductions in migraine days. In this period, patients who had been assigned to the sham cohort gained access to gammaCore and began to show improvement. The data from this trial demonstrated that continued use of our gammaCore therapy provides increased benefit. A *post hoc* completers analysis demonstrated statistically significant and clinically meaningful reductions from baseline at the conclusion of the trial in both cohorts (initial gammaCore randomization cohort, 8.0 migraine-day reduction; initial sham randomization cohort, 6.0).

The primary purpose of this trial was safety and tolerability. Our gammaCore therapy was well tolerated and mild to moderate adverse events were generally similar in both groups.

***The PREMIUM I Trial – Our Registration Trial for the Prevention of Migraine***

Our PREMIUM I trial, or PREMIUM I, was a randomized, double-blind, sham-controlled prospective trial of gammaCore for the prevention of migraine. The trial was conducted at 22 centers in Europe and enrolled 477 patients into a 28-day baseline run-in period, 341 of whom are included in the safety population. Patients were instructed to treat themselves with two 120-second doses of gammaCore therapy or sham treatment, three times per day. Patients randomized to the sham treatment were offered the opportunity to use gammaCore during a 6 month open-label period following a three month blinded randomized period.

The primary endpoint for the trial was a reduction in the average number of migraine days per month during the third month of the randomized period compared to the average number of migraine days per month in the baseline period between the two cohorts.

. . . [W]ith respect to key secondary and exploratory endpoints, statistical significance was achieved across several measurements in the mITT population.

\* \* \*

13

Data from the recently completed open-label period of the PREMIUM trial was generally consistent with the earlier results from the randomized period with continued reductions in the number of migraine and headache days per month, as well as an increase in the number of subjects who had 50% reduction in the number of their monthly migraine days compared to when they started the trial. More specifically, during the open-label phase of the study, it should be noted that the patients who were initially assigned to the active therapy continued to show improvement, reaching average reductions of -2.56 migraine days and -2.52 migraine days after 6 and 9 months, respectively, on gammaCore. Similarly, patients who were initially assigned to the sham arm, who were given access to the active therapy reached -1.82 and -2.08 migraine days after 3 and 6 months, respectively, on the active therapy.

In our PREMIUM trial, no SAEs were attributed to gammaCore. The PREMIUM trial demonstrated that our gammaCore therapy for acute migraine treatment has a highly favorable tolerability profile.

47.     The above statements identified in ¶¶ 42-46 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (i) the Company's lead product, gammaCore, did not enjoy any advantages over other acute treatments for migraines and episodic cluster headaches; (ii) as a result, doctors and patients were unlikely to adopt gammaCore over existing treatments; (iii) the Company's voucher program was not effective to increase adoption of gammaCore; (iv) the Company lacked sufficient resources to successfully commercialize gammaCore; (v) the Company's business plan and strategy was not sustainable because electroCore lacked sufficient revenue to be profitable; (vi) the Company's product registry and efforts were ineffective to initiate reimbursement policies by commercial payors for gammaCore; (vii) the lack of reimbursement would materially impact adoption and sales of gammaCore; (viii) the Company lacked sufficient clinical data demonstrating that gammaCore was effective and safe for migraine prevention; (ix) as a result, the Company's 510(k) submission for the use of gammaCore for migraine prevention was unlikely to be approved by the FDA; and

(x) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

48.    The truth began to emerge on May 14, 2019 when electroCore announced first quarter 2019 financial results that fell short of investors' expectations.  In a press release, the Company reported $410,000 net sales and an operating loss of $14.2 million.

49.    On this news, electroCore's share price fell $1.58 per share, or nearly 30%, to close at $3.75 per share on May 15, 2019, on unusually heavy trading volume.

50.    On August 13, 2019, electroCore issued a press release announcing its second quarter 2019 financial results, reporting net sales of $623,000 and an operating loss of $12.4 million.  Moreover, the press release stated, in relevant part:

**Second Quarter 2019 and Recent Highlights**

* * *

- ***510(k) premarket notification submission for migraine prevention accepted by FDA***

"During the second quarter, we continued to see growth in many of our key metrics, including net sales, paid months of therapy, total prescribers and dispensed prescriptions," said Frank Amato, Chief Executive Officer of electroCore. "Perhaps most notably, the shipments pursuant to our Federal Supply Schedule contract accelerated nicely, with 233 units shipped to VA facilities during the quarter, a significant increase from 66 in the prior quarter. And this momentum continued into the beginning of the third quarter, with 115 shipments in July.

"The comprehensive redeployment and cost reduction plan that we announced in May has made electroCore a more efficient organization capable of quickly reacting to changes in the rapidly evolving headache market. We believe our sharpened focus on our existing or near-term revenue generating opportunities is prudent while we continue to work to add the support of larger payers, which can take some time to bring across the finish line. We believe our non-invasive vagus nerve stimulation technology has applicability across a broad range of high-value indications, and we expect that we will be able to sustain or accelerate our current growth trajectory," Mr. Amato concluded.

**Migraine Prevention Label Expansion Update**

In July 2019, the FDA accepted for review electroCore's 510(k) premarket notification for a new indication for use of gammaCore for the prevention of migraine. Accordingly, the company continues to enroll subjects in the Premium 2 clinical trial to support the label expansion into migraine prevention, and to support the commercialization of gammaCore as a migraine prevention therapy should the indication receive FDA clearance. The company expects to receive the FDA's decision by the end of 2019 and to complete enrollment in Premium 2 in the first half of 2020.

51.    The above statements identified in ¶¶ 48 and 50 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (i) the Company's lead product, gammaCore, did not enjoy any advantages over other acute treatments for migraines and episodic cluster headaches; (ii) as a result, doctors and patients were unlikely to adopt gammaCore over existing treatments; (iii) the Company's voucher program was not effective to increase adoption of gammaCore; (iv) the Company lacked sufficient resources to successfully commercialize gammaCore; (v) the Company's business plan and strategy was not sustainable because electroCore lacked sufficient revenue to be profitable; (vi) the Company's product registry and efforts were ineffective to initiate reimbursement policies by commercial payors for gammaCore; (vii) the lack of reimbursement would materially impact adoption and sales of gammaCore; (viii) the Company lacked sufficient clinical data demonstrating that gammaCore was effective and safe for migraine prevention; (ix) as a result, the Company's 510(k) submission for the use of gammaCore for migraine prevention was unlikely to be approved by the FDA; and (x) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

**The Truth Fully Emerges**

52.    On September 25, 2019, the Company revealed that the FDA requested more information and analysis of clinical data for electroCore's 510(k) submission, which seeks an

16

expanded indication for the use of gammaCore.  In a press release, the Company stated, in relevant

part:

> electroCore, Inc. (Nasdaq: ECOR, or the "Company"), a commercial-stage
> bioelectronic medicine company, today announced that the U.S. Food and Drug
> Administration ("FDA") has requested more information and analysis of the
> clinical data included in the Company's premarket notification, or "510(k)"
> submission, seeking an expanded indication for the use of gammaCore™ (non-
> invasive vagus nerve stimulator). Although the Company has 180 days to respond
> to FDA's request, the Company expects to meet with the FDA in the fourth quarter
> to discuss the information request. gammaCore™ is currently FDA-cleared for the
> treatment of pain associated with episodic cluster headache and migraine headache,
> and adjunctive use for the prevention of cluster headache.
>
> The data submitted in the 510(k) include the results of the Premium 1 study, a
> randomized, double-blind, sham-controlled trial of gammaCore™ . . . . .
>
> "We look forward to meeting soon with the FDA to discuss our 510(k) submission
> and are committed to working with the agency to address their questions as quickly
> as possible," said Tony Fiorino, Chief Medical Officer of electroCore. "Meanwhile
> we continue to recruit subjects into the Premium 2 study which we anticipate will
> further define the clinical utility of gammaCore™ in the migraine space."

53.     On this news, the Company's share price fell $0.79 per share, or over 23%, to close

at $2.57 per share on September 25, 2019, on unusually heavy trading volume.

54.     By the commencement of this action, electroCore's shares continue to trade

significantly below the IPO price of $15.00 per share.  As a result, investors were damaged.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased

or otherwise acquired: a) electroCore common stock issued in connection with the Company's

IPO; and/or b) electroCore securities between June 22, 2018 and September 25, 2019, inclusive,

and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the

officers and directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

56.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, electroCore's common shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of electroCore common stock were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by electroCore or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

59.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of electroCore; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

60.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

61.      The market for electroCore's securities was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, electroCore's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired electroCore's securities relying upon the integrity of the market price of the Company's securities and market information relating to electroCore, and have been damaged thereby.

62.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of electroCore's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about electroCore's business, operations, and prospects as alleged herein.

63.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about electroCore's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

64.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

65.    During the Class Period, Plaintiff and the Class purchased electroCore's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

66.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding electroCore, their control over, and/or receipt and/or modification of electroCore's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning electroCore, participated in the fraudulent scheme alleged herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

67.     The market for electroCore's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, electroCore's securities traded at artificially inflated prices during the Class Period.  On June 22, 2018, the Company's share price closed at a Class Period high of $19.85 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of electroCore's securities and market information relating to electroCore, and have been damaged thereby.

68.     During the Class Period, the artificial inflation of electroCore's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about electroCore's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of electroCore and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted

in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

69.    At all relevant times, the market for electroCore's securities was an efficient market for the following reasons, among others:

a)    electroCore shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)    As a regulated issuer, electroCore filed periodic public reports with the SEC and/or the NASDAQ;

c)    electroCore regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)    electroCore was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

70.    As a result of the foregoing, the market for electroCore's securities promptly digested current information regarding electroCore from all publicly available sources and reflected such information in electroCore's share price.  Under these circumstances, all purchasers of electroCore's securities during the Class Period suffered similar injury through their purchase of electroCore's securities at artificially inflated prices and a presumption of reliance applies.

71.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

72.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of electroCore who knew that the statement was false when made.

## COUNT I
### Violations of Section 11 of the Securities Act
### (Against All Defendants Except Posner)

73.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

74.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the all the Defendants except Posner.

75.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

76.    electroCore is the registrant for the IPO.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

77.    As issuer of the shares, electroCore is strictly liable to Plaintiff and the Class for the misstatements and omissions.

78.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

79.    By reasons of the conduct herein alleged, each Section 11 Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

80.    Plaintiff acquired electroCore shares pursuant and/or traceable to the Registration Statement for the IPO.

81.    Plaintiff and the Class have sustained damages.  The value of electroCore common stock has declined substantially subsequent to and because of the Defendants' violations.

**COUNT II**
**Violations of Section 15 of the Securities Act**
**(Against the Securities Act Individual Defendants)**

82.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

83.    This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act.

84.    The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of electroCore within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause electroCore to engage in the acts described herein.

85.    The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

86.    By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**COUNT III**
**Violations of Section 10(b) of The Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**(Against electroCore and the Individual Defendants)**

87.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

88.    During the Class Period, the Company and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein;

and (ii) cause Plaintiff and other members of the Class to purchase electroCore's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Company and the Individual Defendants, and each of them, took the actions set forth herein.

89.     The Company and the Individual Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for electroCore's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Company and the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

90.     The Company and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about electroCore's financial well-being and prospects, as specified herein.

91.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of electroCore's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about electroCore and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more

particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

92.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

93.    The Company and the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing electroCore's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the Company and the Individual Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, these defendants, if they did not have actual knowledge of the

misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

94.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of electroCore's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Company and the Individual Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Company and the Individual Defendants, but not disclosed in public statements by these defendants during the Class Period, Plaintiff and the other members of the Class acquired electroCore's securities during the Class Period at artificially high prices and were damaged thereby.

95.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that electroCore was experiencing, which were not disclosed by the Company and the Individual Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their electroCore securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

96.     By virtue of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

97.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT IV**
**Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

98.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

99.    The Individual Defendants acted as controlling persons of electroCore within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

101.    As set forth above, electroCore and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  October 31, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jonathan D. Lindenfeld*
Jonathan D. Lindenfeld
Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor

New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jlindenfeld@pomlaw.com
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom*
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein*
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*pro hac vice* applications forthcoming

***Attorneys for Plaintiff***

**Submission Date**

2019-10-03 13:06:22

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.    I  make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against electroCore, Inc. ("electroCore"  or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire electroCore securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired electroCore securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in electroCore securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.

# Name

**Print Name**

Justin Priewe

**Signature**

**Full Name**

Justin Priewe

**electroCore (ECOR)**                                                                 **Priewe, Justin**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 9/10/2019 | Purchase | 1,550 | $3.4400 |
| 9/18/2019 | Purchase | 1,120 | $4.2800 |